Filed 10/15/13  In re David R. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re DAVID R. et al., Persons Coming Under the Juvenile Court Law. | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> CHARLES R., <br><br> Defendant and Appellant. | F066461 <br><br> (Super. Ct. Nos. 516095 & 516096) <br><br> **OPINION** |

-ooOoo-

## THE COURT*

APPEAL from a judgment of the Superior Court of Stanislaus County.  Ann Q. Ameral, Judge.

Hassan Gorguinpour, under appointment by the Court of Appeal, for Defendant and Appellant.

John P. Doering, County Counsel, Carrie M. Stephens, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

* Before Wiseman, Acting P.J., Levy, J., and Kane, J.

Charles R. (father) appeals from the juvenile court's order terminating his parental rights. (Welf. & Inst. Code, § 366.26.)[1] Father contends that the trial court erred in determining that his two children were adoptable because there was evidence that one of the prospective adoptive parents had an unidentified, unexplained criminal conviction on her record.

We disagree and affirm the court's order.

### *FACTUAL AND PROCEDURAL HISTORIES*

Father and Samantha M. (mother) are the parents of David R. and Madison R. When this case began, father lived in Fresno, and mother lived in Modesto with David, Madison, and mother's two younger children, Shawna R. and John R. III.[2]

On May 6, 2011, the Stanislaus County Community Services Agency (Agency) received a referral that mother had been arrested on a School Attendance Review Board warrant related to David not attending school regularly. It was reported that mother appeared to be under the influence of drugs and was homeless. A social worker investigated the referral and learned that the previous day, mother had left David to watch his two-year-old half-sibling John in a motel room where the family was staying for the night. Mother left the motel at 8:00 a.m. with Madison and Shawna and did not return. At 11:00 a.m., a motel employee contacted a relative who picked David and John up from the motel.

On May 10, 2011, the Agency initiated this case by filing a juvenile dependency petition on behalf of the minors. Two days later, it filed an amended petition alleging failure to protect by both parents. (§ 300, subd. (b).) Mother had a history of substance

---

[1]Subsequent statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2]Shawna R. and John R. III are not father's children and are not involved in this appeal. They were part of mother's juvenile dependency case, and we will sometimes refer to mother's four children collectively as the minors.

abuse, including a 10-to-11 year history of methamphetamine use. She also had a history with the Agency, including five substantiated reports of neglect. Father had a history of substance abuse and domestic violence.

The juvenile court found a prima facie showing that the minors were persons described in section 300 and ordered them temporarily detained. Father was ordered to undergo a mental health assessment.

David, Madison, and their two half-siblings were placed with their maternal aunt, Jennifer M. and her partner of many years, Julie S. The minors began living with their aunt on May 6, 2011. According to a jurisdiction/disposition report prepared by the Agency, David told a social worker, "I'm being treated good in Aunt Jennifer and Julie's home," and Madison said, "I like living in Aunt Jennifer's house and we have not had any problems."

The jurisdiction/disposition report incorporated many supporting documents, which were provided to the court as attachments to the report. Among these supporting documents was attachment L, a "delivered service log," with entries from social workers regarding work they had done on the case. In one entry, social worker Maria Pasillas wrote about a home visit to the aunt's house that occurred on May 23, 2011. She wrote the home "appeared clean and organized." Pasillas also logged the following: "I met with Julie and discussed her live scan[3] results. I asked that she provide me [with] an exemption request, 3 reference letters, letter of explanation and a police report. I granted her 2 weeks to turn in all the above documents."

---

[3]"Live Scan" refers to an electronic fingerprinting system used to check an individual's criminal background. (*In re M.L.* (2012) 205 Cal.App.4th 210, 215, fn. 3; see Health & Saf. Code, § 1522.04.) Prior to placing a child in the home of a relative, a social worker must visit the home to ascertain the appropriateness of the placement. (§ 361.4, subd. (a).) A criminal records check of all persons over 18 years of age living in the home is also required. (*Id.*, subd. (b).) This notation appears to document Pasillas conducting the required home visit and discussing the results of Jennifer's criminal background check with her.

The Agency recommended that the juvenile court adjudge the minors dependents of the court and order reunification services for father and mother.

At the hearing on jurisdiction, the juvenile court found the allegations of the amended petition true. In a subsequent hearing on disposition, the court found that returning David and Madison to the custody of either mother or father would create a substantial risk of detriment to their physical and emotional well-being and continued placement outside the home was necessary and appropriate. The court found father's progress toward alleviating or mitigating the causes necessitating placement had been "fair" and mother's progress had been "limited." Reunification services were provided for father and mother.

In April 2012, at a six-month review hearing, David told the court that he did not wish to be placed with his father. David said, "I still think he has a lot to work on. And I believe that he should be required to go through his drug counselings, because I have seen him use and abuse … various forms of drugs and alcohol, and a lot of mental, physical, and sexual abuse has come to me and my sister during the years that I have spent with him." Madison told the court that father did "a lot of bad things" when she and David stayed at his house and "a lot of times he kicked [them] out when he was on drugs." The juvenile court found that the minors' current placement was necessary and appropriate. It found father's progress toward alleviating or mitigating the causes necessitating placement had been "fair" and mother's progress had been "minimal." Continued reunification services were provided for both parents.

The Agency prepared a status review report for the 12-month review hearing. In this report, the Agency recommended terminating family reunification services for father and mother and setting a section 366.26 hearing to establish a permanent plan of adoption for David and Madison. Mother had weekly visits with the minors, which were described as "chaotic," as mother's "lack of parenting skills [became] apparent fairly quickly." Father had one visit on April 9, 2012, and had not completed any visits since then. He

4.

was not participating in his court-ordered treatment programs. The report noted that the minors had been placed "in the approved AB 1695 Relative Placement Home of their Maternal Aunt, Ms. Jennifer M." since May 6, 2011.[4]

A contested 12-month review hearing was held on August 2, 2012. Father's attorney made an offer of proof that father would testify that he had not been participating in his case plan because it was his belief that nobody ever helped him, the caregivers (Jennifer and Julie) had "brainwashed David and Madison into saying untrue things about him," and when the case began, the children had wanted to be with him. Mother testified that, at her visit with the minors the previous day, Madison told her that she did not want to live with mother and she was happy with Aunt Jennifer. Mother told David, "if they wanted to stay and live with Jennifer and Julie, I will help them, if I can sign papers, you know, to where Jennifer and Julie get legal, temporary guardianship or whatever until they turn 18, if that's truly what they wanted."

At the end of the hearing, the juvenile court terminated family reunification services and set a section 366.26 hearing. Father's progress toward alleviating or mitigating the causes necessitating placement was found to be "minimal" and mother's progress was found to be "poor."

The Agency prepared a "366.26 WIC Report" for the permanency planning hearing, recommending that the court terminate parental rights and establish a permanent

---

[4]Assembly Bill No. 1695 added section 362.7 and amended various other statutes relating to foster homes. The bill was intended "to clarify that California's relative caregiver approval process employs the same standards used to license foster care homes in accordance with the federal Adoption and Safe Families Act of 1997 (P.L. 105-89) .…" (Stats. 2001, ch. 653, § 1, p. 4111.) For example, the bill amended section 309, subdivision (d), to add: "The standards used to evaluate and grant or deny approval of the home of a relative or a nonrelative extended family member … shall be the same standards set forth in regulations for licensing foster family homes." (Stats. 2001, ch. 653, § 8, p. 4116.) Thus, "approved AB 1695 Relative Placement" refers to a home that has met these statutory requirements for placement of a foster child.

plan of adoption for the minors. David was developing within average range for his age. He was diagnosed with extreme nearsightedness and it was recommended that he avoid activities that could damage his fragile retinas. David was currently in the eighth grade. He had become much more confident over the prior year, and he was enjoying school and had a lot of friends. The caregivers reported that he had a 3.99 grade point average. Madison was developing within average range for her age. She reported feelings of depression and was receiving individual counseling services. Madison was in the third grade. She also had a lot of friends, enjoyed school, and was earning above-average grades. The report again noted that the minors were placed in "the approved AB 1695 Relative Placement Home of the Maternal Aunt."

The Agency addressed the likelihood of adoption by the minors' current caregivers:

> "It is extremely likely the children will be adopted if the Court terminates the parental rights. As reported above, the children are currently placed with their maternal aunt and her family, Ms. Jennifer M. Ms. Jennifer M. has expressed her commitment to both social workers Croom and Mincey. She loves all the children and is willing to do whatever necessary to ensure they are safe and happy. The children have already integrated themselves in the family and are very comfortable with their life."

The report provided the following information on the prospective adoptive parents:

> **"Social History:**
>
> "The prospective adoptive parents for these children are [Jennifer] and [Julie]. [Jennifer] is the children's maternal aunt. She is a forty-year-old Hispanic female. [Julie], her partner of many years, is a forty-one year old Hispanic female. [Jennifer] has three biological children, two of whom are adults and one of whom is a 17-year-old. Her 20-year-old son and 17-year-old son live in the family home. [Jennifer] is employed full time as an equipment operator for a major local industry, and [Julie] is employed by the same company in a part-time capacity. [Jennifer] and [Julie] reside in a well-established neighborhood in Stanislaus County. Their home is clean, well-organized and appropriate for raising children. Both prospective

adoptive parents are in good health and enjoy an active, child-centered lifestyle.

**"Results of Criminal History Clearance:**

"[Jennifer], her 20-year-old son, and [Julie] completed livescan fingerprinting for adoption purposes on November 20, 2012. All the above mentioned adults completed livescan fingerprinting at the time the children were taken into Protective Custody and prior to the children being placed in their home. Although, the results are not currently available as of the filing date of this report, since they have already submitted fingerprinting without any concerns, the undersigned is confident the livescan fingerprint results would not prohibit them from taking placement of the children.

**"Results of CWS History Clearance:**

"[Jennifer], her 20-year-old son, and [Julie] completed livescan fingerprinting for adoption purposes on November 20, 2012. The results of the Child Abuse Index search had not yet been received at the time of the filing of this report. However, all the adults completed livescan fingerprinting prior to placement and the Child Abuse Index results did not prevent the prospective adoptive parents from taking placement of the children. A review of CWS/CMS indicates that [Jennifer] was the subject of two referrals, one in 2009 and one 2010, for general neglect of one of her children. In both instances, the referrals resulted in a finding of 'Unfounded.'"

The report also noted that Jennifer and Julie "wish to adopt these children because they have known them since birth and cared for them off and on their entire lives," and they "have been meeting the children's needs since May of 2011, a period of over eighteen months."

On December 6, 2012, the juvenile court held a contested section 366.26 hearing. Mother testified that it would be harmful to her children to be adopted by Jennifer and Julie. She said the children "are manipulated a lot verbally and threatened a lot by the both of them." Asked what would be in her children's best interests, mother responded, "Not to be living with Jennifer. I think Julie would [be an] okay sole caregiver for my kids, but not Jennifer. Jennifer—you guys don't know my sister." Father testified that David and Madison could not be telling the truth when they said they wanted to be

7.

adopted. He agreed with mother's testimony and further said "Jennifer is an abusive woman." He explained that he stopped visiting his children because he became discouraged; it was hurtful to go all the way to see them and they did not even acknowledge him.

David testified that he wanted to be adopted by Jennifer and Julie. They were providing him a better home than his previous living conditions. He also said mother's and father's testimony was untrue. Madison testified that she wanted to be adopted by Jennifer and Julie. She was asked if she knew that may mean she would never see her mother and father again, and Madison responded, yes, and she still wanted to be adopted.

Father's attorney repeated father's concern that the current caregivers were manipulating, coercing, and coaching David and Madison. She urged the court to consider providing different caregivers for the children.

The Agency's attorney argued that parents had not raised any relevant issues:

> "The issue for the Court is not to determine whether their foster care situation is the perfect situation. In fact, there is a bevy of case law that says the only argument that counsel for the parents can raise for a child, who is only adoptable because [there] is a specific placement, concerns legal impediments to adoption, and there has been no legal impediment to adoption. It is an emotional flurry of inconsistent and erroneous information that the parents have.

> "I know the Court gave them latitude because of the nature of this hearing, but really the law says we must focus on the children, whether they are by clear and convincing evidence adoptable and whether the parents have demonstrated an exception to that.…

> "So those are the concerns the Court has to address in this hearing. Not whether or not these parents disagree with the placement in these particular caretakers. The only thing that can be addressed appropriately is whether there is a legal impediment to the adoption when the children are adoptable because of a specific placement. That may be the case for the two older children because of their age and their connection to their placement. That certainly is not the case for the two younger kids.

"And I would also point out to counsel, that while these children have always been conflicted about their parents, it was Madison and David that also testified at these very early proceedings that they were afraid of their father. So, while they were at times afraid of him, they at the same time could love him, because that is what conflict in a dysfunctional family oftentimes results in. That's what this has been for these children, and we ask that the madness end and these children have the stability that they deserve .…"

After hearing the parties' evidence and arguments, the juvenile court issued its ruling, terminating parental rights for father and mother. The court found that it was very likely that David, Madison, and their half-siblings would be adopted and that the parents had not met their burden of proving that termination of parental rights would be detrimental to the minors. The court also observed that David and Madison had begun to thrive since the start of the case.

Father filed a notice of appeal on January 11, 2013.

### DISCUSSION

The purpose of a section 366.26 hearing is to select and implement a permanent plan for the dependent child. (*In re S.B.* (2009) 46 Cal.4th 529, 532.) The Legislature's preferred permanent plan is adoption. (*In re D.M.* (2012) 205 Cal.App.4th 283, 290.) "At a section 366.26 hearing, the court must terminate parental rights and free the child for adoption if it determines by clear and convincing evidence the child is adoptable within a reasonable time, and the parents have not shown that termination of parental rights would be detrimental to the child under any of the statutory exceptions to adoption found in section 366.26, subdivision (c)(1)(B)(i) through (vi). (§ 366.26, subd. (c)(1).)" (*Id.* at p. 290.)

In this case, father does not claim that he established a statutory exception to adoption. He contends only that the juvenile court erred in determining that David and Madison were adoptable within a reasonable time.

9.

We review the juvenile court's order terminating parental rights for substantial evidence. This means we determine whether there is substantial evidence from which a reasonable trier of fact could find, by clear and convincing evidence, a factual basis for termination. (*In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1154.) In making this determination, we must "presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) We may not reweigh the evidence or substitute our judgment for that of the juvenile court. (*In re Jamie R.* (2001) 90 Cal.App.4th 766, 774.)

"The issue of adoptability posed in a section 366.26 hearing focuses on the *minor*, e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor." (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649 (*Sarah M.*).) "Usually, the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor. In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family.*" (*Id.* at pp. 1649-1650.) However, "in some cases a minor who ordinarily might be considered unadoptable due to age, poor physical health, physical disability, or emotional instability is nonetheless likely to be adopted because a prospective adoptive family has been identified as willing to adopt the child." (*Id.* at p. 1650.) In the latter cases, courts may determine the minor is "specifically adoptable" because of the existence of identified prospective adoptive parents; this is in contrast to the determination that a minor is "generally adoptable." (E.g., *In re Brandon T.* (2008) 164 Cal.App.4th 1400, 1408 [evidence did not support determination that minor was generally adoptable but supported finding he was

10.

specifically adoptable]; *In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1205 [after concluding evidence did not support finding of "general adoptability," appellate court addressed whether existence of identified prospective adoptive father would support adoptability finding]; but see *In re G.M.* (2010) 181 Cal.App.4th 552, 562 ["Not all dependency cases fall neatly into one of two scenarios: one, the availability of a prospective adoptive parent is *not a factor whatsoever* in the social worker's adoptability assessment; or two, the child is likely to be adopted *based solely* on the existence of a prospective adoptive parent"] (*G.M.*).)

Father contends that the Agency did not meet its burden to prove the children were likely to be adopted within a reasonable time because it failed to provide any information about an unidentified criminal conviction on the record of one of the prospective adoptive parents. He relies on a notation in the record suggesting that Julie had a criminal conviction for which an exemption could be obtained. From this notation, father speculates that the criminal conviction may be a legal impediment to Julie's adoption of David and Madison. We conclude, however, that substantial evidence supports the juvenile court's determination that David and Madison were adoptable. Father has forfeited the issue of possible legal impediment to adoption, and even if he had preserved the issue for appeal, his contention would fail on the merits.

"Once a court sets a hearing pursuant to section 366.26 to select and implement a permanent plan for a dependent child, the department must prepare an assessment (§§ 361.5, subd. (g)(1), 366.21, subd. (i)(1), 366.22, subd. (c)(1)), frequently referred to as an adoption assessment. Such an adoption assessment provides the information necessary for the juvenile court to determine whether it is likely the child will be adopted [citation] and to consequently order termination of parental rights." (*G.M.*, *supra*, 181 Cal.App.4th at p. 559.) Courts have recognized that "'[t]he assessment report is "a cornerstone of the evidentiary structure" upon which the court, the parents and the child are entitled to rely.'" (*In re Michael G.* (2012) 203 Cal.App.4th 580, 590.)

11.

"The assessment report must address the child's medical, developmental, scholastic, mental and emotional status; analyze the likelihood the child will be adopted if parental rights are terminated; describe the efforts made to identify a prospective adoptive parent or legal guardian for the child; and provide a preliminary assessment of the eligibility and commitment of any identified prospective adoptive parent or legal guardian." (*In re Michael G.*, *supra*, 203 Cal.App.4th at p. 590.) Relevant to this appeal, the preliminary assessment of identified prospective adoptive parents must "include a social history, including screening for criminal records and prior referrals for child abuse or neglect, the capability to meet the child's needs, and the understanding of the legal and financial rights and responsibilities of adoption .…" (§§ 361.5, subd. (g)(1)(D), 366.21, subd. (i)(1)(D), 366.22, subd. (c)(1)(D).) "A child's current caretaker may be designated as a prospective adoptive parent if the child has lived with the caretaker for at least six months, the caretaker currently expresses a commitment to adopt the child, and the caretaker has taken at least one step to facilitate the adoption process. (§ 366.26, subd. (n)(1).)" (*G.M.*, *supra*, 181 Cal.App.4th at p. 559.)

Here, the Agency's "366.26 WIC Report" contained a preliminary assessment of the prospective adoptive parents, Jennifer and Julie. The preliminary assessment properly considered their social history, including criminal and child welfare service history. Jennifer, Julie, and Jennifer's adult son had submitted fingerprints to Live Scan for adoption purposes in November 2012, but the results were not available. It was noted that they had completed Live Scan fingerprinting at the time David and Madison were taken into protective custody, and "since they have already submitted fingerprinting without any concerns, the undersigned is confident the livescan fingerprint results would not prohibit them from taking placement of the children." The Agency also reported that Jennifer's home was an "approved AB 1695 Relative Placement." Considered together with other evidence in the record—including evidence that Jennifer and Julie wished to adopt the children, David and Madison wanted to be adopted by them, and David and

Madison had thrived in their care over the previous 18 months—there was substantial evidence to support the juvenile court's determination that David and Madison were likely to be adopted within a reasonable time.

For his contention that the Agency failed to prove David and Madison were adoptable, father relies on the following statement in *Sarah M.*, *supra*, 22 Cal.App.4th at page 1650: "Where the social worker opines that the minor is likely to be adopted based solely on the existence of a prospective adoptive parent who is willing to adopt the minor, an inquiry may be made into whether there is any legal impediment to adoption by that parent .…"[5] Father then points to social worker Pasillas's log entry from May 2011 (which can be found in attachment L to the Agency's jurisdiction/disposition report, filed on June 3, 2011). Documenting her home visit with the prospective relative placement, Pasillas wrote that she met with Julie and discussed her criminal background check. Pasillas asked that Julie provide her with an exemption request, three reference letters, a letter of explanation, and a police report. Julie was given two weeks to provide the documents.

If a criminal records check of the adults in a prospective relative placement indicates that a person living in the home has been convicted of a crime for which an exemption is possible, then a child cannot be placed in the home until a criminal records exemption is granted by the county. (§ 361.4, subd. (d)(2).) An exemption must be

---

[5]The *Sarah M.* court went on to identify three requirements that could pose legal impediments to adoption: (1) the prospective adoptive parent must be at least 10 years older than the child (unless the adoption is by a stepparent, or by a sister, brother, aunt, uncle, or first cousin, and the court is satisfied the adoption by the relative and any spouse would be in the best interests of the parties) (Fam. Code, § 8601); (2) the consent of a child over age 12 is necessary for the child's adoption (Fam. Code, § 8602); and (3) a married person, not lawfully separated from the person's spouse, may not adopt a child without the consent of the spouse, provided that the spouse is capable of giving that consent (Fam. Code, § 8603). (*Sarah M.*, *supra*, 22 Cal.App.4th at p. 1650.) Father does not argue that any of these potential legal impediments may apply in this case.

"based on substantial and convincing evidence to support a reasonable belief that the person with the criminal conviction is of such good character as to justify the placement and not present a risk of harm to the child .…" (*Ibid.*)

Father asserts the record contains no information at all about the nature of Julie's presumed criminal conviction. In our own review of the administrative record, we did not find any further mention of Julie's Live Scan report or any exemption request. Nonetheless, since a child may not be placed in a home unless a criminal records exemption has been granted and, in this case, the children were placed in Jennifer and Julie's home and remained for 18 months, we presume that, if it was necessary, Julie was granted a criminal records exemption. (§ 361.4, subd. (d)(2); Evid. Code, § 664.) In addition, the Agency reported to the court on at least two occasions that Jennifer and Julie's home was an "approved AB 1695 Relative Placement," implying that the home met all statutory requirements.

Now, for the first time, father speculates that Julie's criminal conviction may be a legal impediment to adoption because it may fall within the list of criminal convictions that would disqualify her from adopting. (Fam. Code, § 8712.)[6] If father had sought to introduce evidence regarding a potential legal impediment to adoption, the juvenile court would have been obligated to admit it. (*G.M.*, *supra*, 181 Cal.App.4th at p. 561.) But father did not raise the issue that Julie's prior criminal conviction might preclude her from adopting.

In *G.M.*, *supra*, 181 Cal.App.4th at page 560, the mother raised, for the first time on appeal, the issue of whether there was a legal impediment to the prospective adoptive

---

[6]Family Code section 8712, subdivision (b), provides that "the criminal record, if any, shall be taken into consideration when evaluating the prospective adoptive parent .…" In addition, certain listed felonies preclude approval for adoptive placement. These include felony convictions for child abuse or neglect, spouse abuse, crimes against a child, crimes involving violence, including rape, sexual assault, or homicide, but not including other physical assault and battery. (Fam. Code, § 8712, subd. (c)(1)(A).)

parent's adoption of mother's two children. Family Code section 8603 provides that a married person who is not lawfully separated cannot adopt without the spouse's consent. In *G.M*, the mother argued that the prospective adoptive parent, the minors' great-aunt, might not be eligible to adopt because there was evidence that she had been married and there was no documentation showing a lawful separation. Therefore, it was possible that the great-aunt was not lawfully separated from her husband and could not get his consent. (*G.M., supra,* at p. 560.) Our court recognized that, whether the great-aunt was eligible to adopt would have been relevant at trial; mother could have, for example, asked either the social worker or the great-aunt about whether she was lawfully separated or could obtain her husband's consent to an adoption. (*Id*. at pp. 562-563.) The mother, however, made no such effort at trial. As a result, the "mother failed to properly preserve for appellate purposes her claim of trial court error." (*Id*. at pp. 563-564.) Likewise, in this case, father failed to raise the legal-impediment question in the juvenile court. Consequently, he may not raise it for the first time on appeal.

Father tries to get around his failure to raise the issue of possible legal impediment by framing his appellate claim as a challenge to the sufficiency of the evidence. We have concluded, however, that substantial evidence in the record supports the determination that David and Madison were adoptable. We observe that the Agency prepared an adequate adoption assessment, addressing the statutorily required considerations and providing facts to support adoptability. This case is therefore unlike *In re Brian P.* (2002) 99 Cal.App.4th 616, on which father relies. In *Brian P*., the "juvenile court did not have the benefit of an adoption assessment report, which would have presented the kind of facts needed to support a finding of adoptability." (*Id*. at p. 624.)

Finally, even if father had preserved the issue on appeal, it would fail. As the Agency points out, the list of crimes that are a legal impediment to adoption under Family Code section 8712 is almost identical to the list of crimes that preclude foster child placement. (§ 361.4; Health & Saf. Code, § 1522, subd. (g)(1).) Since Julie

presumably was able to obtain a criminal background exemption for placement, her criminal conviction would most likely not bar her from adopting either. There are some crimes for which an exemption is possible under Health and Safety Code section 1522 (for foster care licensing), but no exemption is provided in Family Code section 8712 (for adoption). These crimes are mayhem, any felony punishable by death or imprisonment in the state prison for life, and any felony in which the defendant inflicts great bodily injury. (Health & Saf. Code, § 1522, subd. (g)(1)(A)(ii); Pen. Code, § 667.5, subd (c)(2), (7), (8).) To obtain an exemption for conviction of one of these crimes requires a showing that the person seeking the exemption "has been rehabilitated as provided in Section 4852.03 of the Penal Code, has maintained the conduct required in Section 4852.05 of the Penal Code for at least 10 years, and has the recommendation of the district attorney representing the employee's county of residence, or if the employee or prospective employee has received a certificate of rehabilitation pursuant to Chapter 3.5 (commencing with Section 4852.01) of Title 6 of Part 3 of the Penal Code." (Health & Saf. Code, § 1522, subd. (g)(1)(A)(ii).)

Father suggests that Julie may have been convicted of one of these crimes, i.e, mayhem, a felony punishable by death or life imprisonment, or a felony inflicting great bodily injury. But if that were the case, the social worker would have asked Julie for evidence supporting this type of exemption. Here, however, the social worker did not ask Julie for a recommendation from the district attorney or any other documents indicating that Julie's criminal conviction was the type that would require such extensive evidence of rehabilitation. In other words, the record does not support an inference that Julie has a criminal conviction that would be a legal impediment to adoption.

## *DISPOSITION*

The juvenile court order is affirmed.